UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:07-cr-168 LJO |
| | ) | |
| Plaintiff, | ) | SENTENCING |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN DELOS WILSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Fresno, California                Friday, June 13, 2008


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

APPEARANCES OF COUNSEL:

For the Government:                SHEILA K. OBERTO
                                   Assistant U.S. Attorney
                                   2500 Tulare Street
                                   Suite 4401
                                   Fresno, California  93721

For the Defendant:                 MELODY M. WALCOTT
                                   Assistant Federal Defender
                                   2300 Tulare Street
                                   Suite 330
                                   Fresno, California  93721

1   Friday, June 13, 2008                    Fresno, California

2                                            1:30 p.m.

3

4        THE COURT:  All right, let's call the case of United

5   States versus John Wilson, action number 168.  Can I have your

6   appearances for the record, please.

7        MS. WALCOTT:  Melody Walcott, Federal Defender's

8   office with John Wilson who is present in custody.

9        MS. OBERTO:  Good afternoon, Your Honor.  Sheila

10  Oberto for the United States, and I'm here with United States

11  Postal Inspector Jude Densley.

12       THE COURT:  All right.  Today is the date set for

13  judgment and sentencing in this case.  Is there any reason we

14  should not proceed?

15       MS. OBERTO:  No, Your Honor.  Has the Court received

16  our filings?

17       THE COURT:  You're talking about the binder?

18       MS. OBERTO:  Yes, the binder and the motion.

19       THE COURT:  What motion?

20       MS. OBERTO:  Our motion for government's sentencing

21  memoranda and motion for upward departure.

22       THE COURT:  Yes, I did.

23       MS. OBERTO:  Thank you.

24       THE COURT:  And that was part of the binder itself.

25       MS. OBERTO:  Yes.

1      THE COURT:  I just wanted to make sure there wasn't a

2  motion I didn't see.  Any reason we should not proceed?

3      MS. WALCOTT:  No, Your Honor.  I do want to just say

4  one thing before we start.  Mr. Wilson was brought over this

5  morning.  I thank the marshals for assisting us in allowing to

6  play the CD's for him there in the lockup.  He was brought

7  over this morning, and while we were sitting there, he

8  actually slipped off the stool and fell on to the floor.  He

9  just advised me that he has a little -- some kind of a crick

10  or twitching in his back, but other than that, he is okay, and

11  he wants -- he does want to go forward because that was the

12  first question I asked him.

13      THE DEFENDANT:  Your Honor, what happened was, I

14  stood up to walk back to get away from the chair because we

15  were done, and when I stood up, I tripped with -- the chair's

16  got like a little bar down on it.  When I stepped back, I

17  tripped and just fell back.

18      THE COURT:  Are you under any medication?

19      THE DEFENDANT:  No, I'm not.

20      THE COURT:  Do you believe that whatever the issue is

21  with regard to your -- I don't know if you have pain or not,

22  but if you do, is it to the point where you are not going to

23  be able to pay attention?

24      THE DEFENDANT:  No.  I can pay attention.  I just

25  wanted the Court to know.  I wanted somebody to tell somebody

1   that I had fallen, and that I did have a twitch in my back so

2   it would be documented and known that I did fall just in case.

3   I just wanted it to be known.

4           THE COURT:  Okay.

5           MS. WALCOTT:  I did advise the marshals before I left

6   that he had fallen off the stool.

7           THE COURT:  Did you hit your head?

8           THE DEFENDANT:  No, I did not hit my head.  Just

9   landed flat on my back.

10          THE COURT:  All right.  I will tell everyone that I

11  have received and reviewed the 28-page presentence report of

12  April 29th.  Also I have re-reviewed the 11(c) agreement and

13  the Government sentencing memorandum, including voluminous

14  attachments and including, but not limited to, the tapes which

15  were Exhibits D and G.

16          Was anything else submitted by anyone?

17          MS. WALCOTT:  No, Your Honor.

18          THE COURT:  No?  All right.

19          Mr. Wilson, did you have an opportunity to review the

20  presentence report?

21          THE DEFENDANT:  Yes, I did.

22          THE COURT:  Did you understand it?

23          THE DEFENDANT:  Yes, I did.

24          THE COURT:  And is there anything that you believe is

25  incorrect?

1    THE DEFENDANT:  Well, there were some statements made

2  about -- she's going to take care of that here in a few

3  minutes.

4    THE COURT:  Okay.  Do you wish to be heard?

5    MS. WALCOTT:  Yes, Your Honor.

6    Your Honor, we have reviewed the presentence report.

7  As I said, Mr. Wilson and I had the opportunity to --

8  principally he and the investigator actually had the

9  opportunity to -- he had the opportunity to listen to CD's

10  this morning.  I don't have any corrections to the presentence

11  report.  We do have a -- we are denying the allegations made

12  in paragraph 64.  They address the incident in Texas.  We are

13  denying those allegations.

14    Other than that, I don't have any real comment about

15  the report itself.  The report does talk about the things that

16  Mr. Wilson spoke of during the interview.  Again, I just want

17  to mention to the Court that our -- the agreement between

18  myself and the government is -- or between Mr. Wilson and the

19  government is that we are able to argue for the bottom -- we

20  have set a range at 97 to 121.  Our initial agreement was 78

21  to 96, I believe it was.  And we added two levels for

22  obstruction, which we thought was correct.  We came to an

23  agreement of an argument for a range of 97 to 121.  We are

24  free to argue for 97.  The Government is free to argue for

25  121, and we are asking for the bottom of the range, 97 months.

1    I believe that any information that the Court would

2 need to make that decision is already in the report.  There is

3 a mention of physical abuse suffered by Mr. Wilson when he was

4 growing up.  He has asked me to ask the Court for a couple of

5 things.  One is for a recommendation for Seagoville, Texas for

6 incarceration on the federal charges.  The other is for a drug

7 treatment program and for an anger management program.

8    Other than that, Your Honor, I'm going to submit it.

9    THE COURT:  All right.  Mr. Wilson, you have a right

10 to address the Court if you wish.  You have no obligation, but

11 you do have a right.  Is there anything you wish to tell me?

12    THE DEFENDANT:  The only thing I wish to ask is

13 basically the same thing I asked my attorney just a few

14 minutes ago, but I'll go ahead and ask the Court anyway.  If

15 the Court goes over the 121 guideline, is there any way I can

16 appeal that issue?

17    THE COURT:  My understanding of the plea agreement is

18 no.  Does either counsel wish to be heard on that?

19    MS. OBERTO:  That is correct, Your Honor.  The appeal

20 rights have been waived in this case.

21    MS. WALCOTT:  There is only one issue that is open.

22 That is the issue that Mr. Wilson raised at an earlier time

23 regarding his assignment of counsel.  That is laid out in the

24 plea agreement.  That is the only issue that was left open.

25    THE COURT:  Yes, I believe that he felt that he

1    should be able to select specifically the attorney that was

2    appointed to him.

3            THE DEFENDANT:  That was not what -- that was not

4    what --

5            MS. WALCOTT:  Well, it's laid out in the plea

6    agreement.

7            THE COURT:  But the answer to your question,

8    Mr. Wilson, is no.

9            Is there anything else you want to address the Court?

10           THE DEFENDANT:  That's it.

11           THE COURT:  Pardon me?

12           THE DEFENDANT:  That's all.

13           THE COURT:  That's it?

14           MS. OBERTO:  And, Your Honor, and also for the

15    record, the plea agreement was entered into before the

16    Government became aware of the letters that were found at the

17    house of the defendant's wife and his 12-year-old daughter.

18           I can argue, Your Honor.  I can set forth the facts

19    in the brief.  I think I've already done that.  So I'm not

20    going to take up the Court's time.  But, Your Honor, with

21    respect to the incident in Texas, we have set forth -- U.S.

22    Postal Inspector Jude Densley is here.  She is the one that

23    interviewed Mr. Bingham.  She got the records.  There is no

24    question that that incident involved Mr. Wilson.  But

25    notwithstanding that incident, there are a number of

1  aggravating factors in this case.  If the Court would like, I

2  can go through them.  I've laid them out in my sentencing

3  memorandum.

4          THE COURT:  Which I have read.

5          MS. OBERTO:  Thank you very much, and I do want to

6  thank the probation officer in this case.  I know she did a

7  lot of work, and we didn't make it a whole lot easier for her

8  with respect to the sentencing guideline, so I appreciate all

9  the work Miss McAnulty put into it.

10          THE COURT:  All right, is the matter submitted?

11          MS. WALCOTT:  Submitted, Your Honor.

12          MS. OBERTO:  Yes.

13          THE COURT:  The applicable offense level is -- hang

14  on just one second.  I do have one question.  It may be for

15  the probation officer.  Hang on one second before I start.

16          Miss McAnulty, what do you believe now is the

17  applicable offense level?

18          MS. McANULTY:  The applicable offense level,

19  Your Honor, would be 19, with a criminal history category of

20  Roman numeral III, before an upward departure.

21          THE COURT:  And the upward departure that you're

22  referring to, are you talking about that which is described in

23  paragraphs 97, 98, 99 and 100?

24          MS. McANULTY:  Yes, Your Honor.

25          THE COURT:  All right.  Without any upward departure,

1  the applicable offense level is 19.  The criminal history

2  category is III.  And the guideline range is 37 to 46 months,

3  with the upward departure, and specifically looking at the

4  paragraphs I have just referred in the presentence report, the

5  applicable level would be 29, Criminal History III, and the

6  guideline range 108 to 135.

7       The counts here that we're dealing with are Counts 2

8  and 3, and the Court is going to go into some specificity with

9  regard to the 3553(a) factors the Court did consider.

10      There will be ultimately a motion, I assume by the

11 Government, to dismiss Count 1, which is the remaining count

12 as a result of the plea bargain?

13      MS. OBERTO:  Yes, Your Honor.

14      THE COURT:  And the appellate rights have been

15 waived.

16      It is noteworthy for the purposes of sentencing to

17 make certain that the record is clear that at the time of this

18 offense or these offenses, Counts 2 and 3, the defendant was

19 serving a 12-year state prison sentence from Kern County

20 Superior Court.  It appears from October of 2003 for

21 continuous sexual abuse of a child pursuant to Penal Code

22 Section 288.5, and he was serving his sentence at Corcoran

23 State Prison.

24      In that case, the victim was an eight-year-old friend

25 of the defendant's daughter.  And as a result of the plea

1   bargain in Kern County Superior Court, charges of a sexual

2   nature involving the defendant's 12 year old daughter as a

3   victim were dropped.

4          The indictment in this case, dated March 21st of '08,

5   and that's an important date as is the date of the change of

6   plea, because of that which Miss Oberto has pointed to

7   concerning additionally discovered evidence of the magnitude

8   that could have brought additional charges had the information

9   been known.

10          MS. OBERTO:  I'm sorry, Your Honor.  The Court

11   referred to "indictment."  Does the Court mean the "plea

12   agreement"?

13          THE COURT:  Actually it was -- the indictment was --

14   yes.  I misspoke.  But I'm referring to is the date that's

15   important is the March 21, '08 plea date because that's the

16   date that determines whether or not information that was

17   thereafter discovered, that could have been the subject of

18   additional counts or additional charges.  That is considered

19   by the Court for, of course, sentencing purposes.

20          Counts 2 and 3 in the indictment are violations of 18

21   United States Code Section 1470, both counts.  The first is an

22   attempt to transfer obscene material to a minor by mail.  And

23   the Count 3 is attempt to transfer obscene matter to a child

24   to access a father/daughter incest stories and printout or

25   copy material to the defendant.  In other words, getting a

1  12-year-old girl to do that.

2         Counts 2 and 3 -- and the reason I'm pointing this

3  out exactly what the counts are, they are clearly two

4  independent counts, and they are not reliant or dependent on

5  one another.  The Court is considering the sentence guidelines

6  as it must do under 3553(a)(4)(A), and the Court does note

7  that the statutory maximums are 10 years each count and

8  $250,000 fine, or both, plus $100 special assessment, which is

9  mandatory on each count.

10        And in addition, even though there was some

11 discussion apparently during plea negotiations, not involving

12 the Court, of course, but nonetheless plea negotiations, the

13 supervised release maximum is three years.

14        In reviewing -- hang on just one second.  The

15 presentence report, specifically at paragraph 95 under

16 sentencing guideline 5k2.0(a)(1)(B), the grounds for departure

17 state in part that the Court can depart upward in the case of

18 child crimes and sexual offenses.  If the Court finds pursuant

19 to 18 United States Code 3553(b)(2)(A)(1), there exists an

20 aggravating circumstance of a kind or to a degree not

21 adequately taken into consideration by the guidelines.

22        In addition, under 5K2.3, extreme psychological

23 injury states that an upward departure may be warranted if the

24 victim suffered psychological injury much more serious than

25 that normally resulting from the commission of such an

offense.   This section further states that the Court should

consider the extent to which such harm was likely, given the

nature of the defendant's conduct, which I will address in

just a moment.

It is agreed that additional -- and I'm talking about

between the parties here, that additional following -- the

following additional specific offense characteristics were not

calculated in the guideline application, specifically

guideline 2G3.1(b)(1)(B), and that is the distribution for the

receipt or expectation of the receipt of a thing of value, but

not for pecuniary gain.

In addition, guideline 2G3.1(b)(1)(C), and -- and

that's the distribution to a minor.

In addition, it is to be considered, and I am

considering that the defendant victimized his biological

daughter over an extended period of time, and with regard to

the psychological damage issue, the very nature of the offense

is such that psychological damage is inevitable.

I am also well aware that after the plea in the case,

that being the plea date of March 21st of 2008, more letters

from the defendant to his daughter were found in the residence

that the daughter and her -- the rest of her family vacated.

And as I indicated at the beginning, the defendant was

convicted of a prior sex offense and was sentenced to the

12-year prison sentence on the state side.   And obviously this

1     had -- I wouldn't say little impact, I'd say no impact in

2     stopping his behavior.

3           The prison issue, the 12-year prison issue is more

4     specifically as a result of numerous instances of oral

5     copulation by the defendant on the eight-year-old victim and

6     an attempted sodomy, and that goes to the 3553(a)(1) issue,

7     specifically the history and characteristics of the defendant.

8           With regard to the repeated phone calls from the

9     prison to his minor daughter, that goes to the issue of

10     3553(a)(2)(A), to wit, the seriousness of this offense.  I

11     spent however many hours it took, and I listened to every

12     tape, and I am stating for the record that should this --

13     should the appellate court ever have an issue, even though the

14     issue, I believe, has been waived, should they ever have the

15     need to review this record that I am stating, that the

16     listening of the tape was of extreme importance for this court

17     to get a full grasp of the severity of this crime.

18           I don't think that just simply reading the

19     transcripts could possibly give a reviewing court or, for that

20     matter, this court, the sentencing court, the understanding of

21     the gravity of the offense, in that there were numerous

22     instances of predatory behavior, the manner in which

23     Mr. Wilson was trying to convince his daughter to get on board

24     with this perverse behavior and criminal behavior; the

25     patience shown, the technique of throwing out the issues,

throwing out the invitations, and quickly moving away from
them so that there wouldn't be a response, and then coming
back to them.  It was -- the only analogy I could think of was
fishing and playing the fish to get on the hook.  And how
someone could treat a child, let alone his own daughter, in
that fashion is beyond comprehension, but I do not believe
that it could possibly be understood if a sentencing court or
a reviewing court did not listen to those tapes.

And with regard to those 15 conversations that are
referred to in Exhibits B-1 through 15 of the Government's
sentencing information outline it well, but in addition to all
of the other things that I'm talking about, the manner, the
making certain that his daughter felt the guilt of not giving
her father what he wanted, the apparent false claim that there
was suicide contemplated by the defendant, and that he was on
suicide watch, the gall of referring to the Bible,
specifically Genesis 19, to get his daughter to read part of
the Bible to convince her that sleeping with her father is
somehow sanctioned by the Bible.

The discussion of the photographs and the erasing, in
other words, trying to cover his tracks, a further indication
that it was planned.  That he was doing everything in his
power to do what he wanted to do.  The discussion of having
her take a picture of her vagina in close-up fashion, and then
explaining how to smuggle that picture past the guards, past

1   the prison people on the state side so that the -- so that the

2   defendant could view it and masturbate as a result of it; the

3   attempted destruction or the telling her to destroy drawings,

4   the filthy drawings that were apparently as a result of his

5   artwork showing him and his daughter in full intercourse, and

6   another drawing showing his daughter in a position of getting

7   ready for something else is beyond description, how anyone

8   could possibly believe that they are a part of the human race

9   and do what you did.

10          In addition, Exhibit C, that is a part of the

11  Government's submission and the discussions that I believe are

12  pertinent under 3553(a)(1), again, the history of uncharged

13  conduct, the requests of -- in letters of asking a young

14  teenaged girl to put vaginal secretions on a letter and send

15  it back to prison so he could somehow take advantage of the --

16  the smell sensation, the -- Exhibit E of the Government's

17  submission on the camping and motel incident, and I agree with

18  the Government that it's not necessary, and it would not

19  change the sentencing one iota on the Jeb Bingham issue, the

20  eight-year-old boy incident or the Misty Bingham incident,

21  which is Exhibit E-3 concerning the driving her out to the

22  middle of nowhere and doing what he wanted to do.  And Exhibit

23  G, the recordings, the audio recordings of the 16-year-old

24  Kimberly Wegener, W-E-G-E-N-E-R, attempting to groom her is

25  certainly the right term.  That's exactly what he was doing

1    when his daughter over and over and over and over again did

2    everything that she could do not to insult her father.

3    Somehow she felt just by the biological connection, that he

4    was entitled to that absence of insult.  And I'm sure it was

5    only because of her age that she came to that conclusion and

6    her immaturity.  That he decided that it was time to talk to

7    someone else, another teenager, another teenage girl to get

8    her to become close.

9         I am convinced absolutely that any sentence given

10    would not involve unwarranted sentence disparities under

11    3553(a)(6) because in the 18 years I've been a judge, I have

12    seen only one other case, and I have seen no other case that

13    were under the federal guideline auspices that was so heinous,

14    deprived, or antisocial as this case.  And the other case, the

15    defendant was sentenced to over 300 years.

16         The primary focus for this court is the protection of

17    the public, specifically children.  Mr. Wilson is, without any

18    question, a dangerous child predator who is either a hundred

19    percent selfish or cannot control his criminal behavior

20    against minors, or both, which is evidenced by the beyond

21    belief risks that he took knowing that his verbal conduct was

22    being recorded, and taking the chance that nobody at the state

23    court level would listen, and sending writings of the nature

24    he did, including the quote, unquote, artwork, and the letters

25    and their content, knowing that somebody else could discover

them, knowing somebody else could read them, knowing somebody
else could find them, and then ultimately knowing that they
could all be used against him.  The 3553(a)(2)(C) factor, I
don't believe that there is a possible sentence that I could
give him that is severe enough under the law that would
protect the public other than incarceration.  And I can't give
him more than the statute provides.  But the statute,
unfortunately in this case, is not going to adequately protect
society and certainly not the children who are out there
waiting or, should I say, he's waiting for them.

        The defendant is a skilled manipulator.  He grooms
and then moves in for the proverbial kill, and I'm not sure
it's so proverbial because there are other ways to kill people
other than take their life physically.  You take it mentally.
You have ruined your daughter.  There is no way that she is
ever going to get over what you've done.  You have ruined
apparently other people, but I'm focusing in on the victim in
this case.  Your actions are deliberate and you are a
relentless pursuer of sexual activity.

        You truly suck the lifeblood out of children, and it
is inexcusable.  You throw them away, frankly, like they're
used pieces of Kleenex, and where you think you got that
right, sir, I don't know.

        I believe there is only one way to protect the minors
and society in this case, and I am going to do what I have not

1    done in the past as a federal judge, and that is I am going to

2    ignore completely the plea agreement, and I'm going to do what

3    needs to be done.  And I'm going to do what the society is

4    entitled to, and I'm going to do what is the right thing to do

5    to protect children that probably aren't even born yet that

6    would be in your sight as soon as you got out.  If ever there

7    were a reason for Congress -- for Congress' maximum statutory

8    sentence to apply, this is the case.

9              Pursuant to the Sentencing Reform Act of 1984, it is

10   the judgment of this court that you, Mr. Wilson, are committed

11   to the custody of the Bureau of Prisons to be imprisoned for a

12   term of 120 months on Count 2, and 120 months on Count 3 to be

13   served consecutively with one another, to one another, and

14   consecutively to the term of imprisonment that you face in the

15   state system, that being Kern County Case Number RF0041048.

16             You shall pay a special assessment of $200, payment

17   to begin immediately.  The Court finds you do not have the

18   ability to pay the fine, and that is waived.

19             Upon release from imprisonment, you shall be placed

20   on supervised release for the maximum term prescribed by law

21   of 36 months on Count 2, 36 months on Count 3.

22             Let me ask you, Miss McAnulty, is there any reason

23   that cannot be consecutive as well?

24             MS. McANULTY:  Your Honor, I just asked the

25   supervisor.  He said they have to be ran concurrently.

1       THE COURT:  I will state for the record that if they
2   didn't have to be run concurrently, they would be run
3   consecutively because it is my intent -- and let the record be
4   very clear on this, if I could give you more time under the
5   law, I would.
6       Within 72 hours release from the custody of the
7   Bureau of Prisons, you shall report in person to probation in
8   the district where you are released.  While on supervised
9   release, you shall not commit another federal, state, or local
10  crime, or possess a firearm as defined in 18 United States
11  Code, Section 921 and shall not illegally possess controlled
12  substances.  You shall submit to the collection of DNA and
13  comply with the standard conditions recommended by the United
14  States Sentencing Commission and adopted by this court.
15      You shall refrain from any unlawful use of any
16  controlled substance.  You shall submit to one drug test
17  within 15 days of release from imprisonment and at least two
18  thereafter, not to exceed four per month.
19      You shall also comply with the following special
20  conditions:  You shall not possess or have access to any
21  paging device or any cellular phone without the advanced
22  permission of the probation officer.  You shall provide all
23  billing records for any such devices, whether used for
24  business or personal to probation upon request.  As directed
25  by the probation officer, you shall participate in a program

1   of mental health treatment, in or outpatient.  As directed by

2   probation, you shall participate in a co-payment plan for

3   treatment or testing and shall make payment directly to the

4   vendor under contract with the United States Probation Office

5   of up to $25 per month.

6           You shall submit to the search of your person, your

7   house, residence, vehicle, papers, computer, other electronic

8   communication or data storage devices or media and effects at

9   anytime with or without a warrant by any law enforcement or

10  probation officer in the lawful discharge in the officer's

11  supervision functions with reasonable suspicion concerning

12  unlawful conduct or a violation of a condition of probation or

13  supervised release.

14          You shall have no contact with any children,

15  including your own, under the age of 18 unless approved by the

16  probation officer in advance.

17          You are not to loiter within 100 feet of any

18  schoolyard, park, playground, arcade, or any other place

19  primarily used by children under the age of 18.  This shall

20  include that you are not to engage in any occupation, either

21  paid or volunteer, which exposes you directly or indirectly

22  with children under the age of 18.

23          You shall consent to the probation officer and/or

24  probation service representative conducting periodic

25  unannounced examinations of any computer or computer-related

device or equipment that has an internal or external modem
which is in the possession or control of you.  You shall
consent to retrieval and copying of all data from any such
computer, computer-related device, or equipment as well as any
internal or external peripherals to ensure compliance with
conditions.

You shall consent to removal of such computer,
computer-related device and equipment for purposes of
conducting a more thorough inspection and analysis.  You shall
consent to having installed on any computer you have,
computer-related device, and any equipment at your expense any
hardware or software systems to monitor the use of such
computer, computer-related device, any equipment at the
discretion of the probation officer, and you must agree not to
tamper with that hardware or software and not install or use
any software program designed to hide, alter, or delete your
computer activities.  You shall consent to not installing new
hardware without the prior approval of the probation officer.

You shall not possess, own, use, view, read, or
frequent places with any sexual explicit material in any form
that depicts children under the age of 18.  Sexually explicit
conduct is defined under 18 United States Code Section
2252(2).  It means actual or simulated sexual intercourse,
including genital-genital, oral-genital or oral-anal, whether
between the same or opposite sex.  It includes bestiality,

masturbation, sadistic or masochistic abuse or lascivious exhibitions of the genitals or pubic area of any person under the age of 18.

You shall provide all requested business and personal phone records to the probation. You shall disclose to the probation officer any existing contracts with telephone line and/or cable service providers. You shall provide the probation officer with written authorization to request a record of all outgoing and incoming phone calls from any service provider.

You shall attend, cooperate with, and actively participate in a sex offender treatment and therapy program which may include, but is not limited to, risk assessment, polygraph examination, computer voice stress analysis and/or ABEL assessment as approved and directed by the probation officer and as recommended by the assigned treatment provider.

You shall register as required in the jurisdiction in which you reside as a sex offender. As directed by probation, you shall participate in a program of testing, breath, urine, a sweat patch and the like to determine if you have reverted to any use of drugs or alcohol.

With regard to the request, I will make the recommendation at an institution in Texas, but only as that applies to their security classification and space availability. Also I'll recommend the drug treatment and

1  anger management courses.

2        With regard to the appellate right, that must be --

3  it is limited, as we know, pursuant to the plea agreement.

4  And if you desire to appeal that limited issue, you must file

5  your Notice of Appeal in writing with the Court within 10 days

6  of today's date.  If you cannot afford an attorney for that

7  appeal, one will be appointed for you.

8        Is there anything else?

9        MS. OBERTO:  Your Honor, the Court indicated -- and I

10  may have misheard this.  That it will completely -- ignore

11  completely the plea agreement.  Did the Court intend to say

12  that it's ignoring the agreement of the parties with respect

13  to the sentence?

14        THE COURT:  That's all I'm ignoring.  I am obligated

15  to consider it.  I'm not ignoring it pursuant to my

16  obligations to consider it, but I am ignoring the agreement

17  itself as far as the sentence.

18        MS. OBERTO:  Thank you.  I just wanted to clarify.

19  So the Court did sentence pursuant to the plea agreement.

20        THE COURT:  I certainly did.

21        MS. OBERTO:  Thank you very much.

22        THE COURT:  Anything further?

23        MS. WALCOTT:  No, Your Honor.

24        THE COURT:  We'll be in recess.

25        MS. OBERTO:  Your Honor, at this time, we would move

1   to dismiss Count 1 pursuant to the plea agreement.

2        THE COURT:  Yes, pursuant to the plea agreement, and

3   obviously that's an additional consideration as an indication

4   that I must follow parts of it and will follow parts of it.

5   The parts that I find appropriate under the circumstances,

6   your motion is granted.

7        MS. OBERTO:  Thank you, Your Honor.

8        THE COURT:  We'll be in recess.

9        (Court was adjourned at 2:11 PM.)

10

11

12

         I, Gail Lacy Thomas, Official Court Reporter, certify
13   that the foregoing transcript is true and correct.

14

Dated:  07/15/2008          /s/ Gail Lacy Thomas
15                            GAIL LACY THOMAS, RMR-CRR

16

17

18

19

20

21

22

23

24

25